James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERIC FISHON, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>STELLANTIS N.V. and FCA US LLC d/b/a/ STELLANTIS NORTH AMERICA,<br><br>Defendants. | Civil Action No.__________________<br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Eric Fishon ("Plaintiff"), on behalf of himself and all others similarly situated ("Class Members") (collectively "Plaintiffs"), allege the following against defendants Stellantis N.V. and FCA US LLC d/b/a Stellantis North America (together "Stellantis" or "Defendants"). These allegations are based on personal knowledge as to Plaintiff's conduct and are made on information and belief as to all other matters based on an investigation by counsel.

## I. INTRODUCTION

1. This is a class action lawsuit brought by Plaintiff, individually and on behalf of all others similarly situated, who purchased or leased a 2020-2024 Jeep Wrangler 4xe and/or 2022-2024 Jeep Grand Cherokee 4xe ("Class Vehicle" or "Class Vehicles").[1]

2. All Class Vehicles are "hybrid" vehicles designed and equipped with both a traditional gas-powered internal combustion engine and a sealed Lithium-ion high voltage battery ("Battery") that is used to power the electric powertrain systems and the 12 Volt vehicle electrical system.[2]

3. The use of the electric powertrain systems in such hybrid vehicles can offer several benefits, including increased power and fuel economy.

4. The Class Vehicle Battery is designed to last for "the life of [the] vehicle."[3]

5. The high voltage battery packs are defective in that they all contain battery cells which are susceptible to separator damage ("Battery Defect").

---

[1] Plaintiff reserves the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles.

[2] Wrangler 4xe Class Vehicles have the Battery equipped under the rear seat, while Grand Cherokee 4xe Class Vehicles have the Battery equipped underneath the vehicle.

[3] Stellantis, *Jeep Wrangler 4xe Owner's Manual*, 14 (2024); Stellantis, *Jeep Grand Cherokee 4xe Hybrid Supplement*, 6 (2024).

6. Separator damage, combined with other complex interactions between the cells, may cause the Class Vehicle to lose all power when driven and catch fire while driven or parked.

7. As a result, every Class Vehicle contains the Battery Defect, which can cause the Class Vehicle to catch fire while driven or parked.

8. As a result of Stellantis's misconduct, Plaintiff and other Class Members were harmed and suffered actual damages in the form of overpayment for their vehicles, diminished value, repairs and other expenses and damages related to the undisclosed Battery Defect, which Defendants have failed to remedy or fully disclose, and exposure to vehicle fire that results in an increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage.

## II. FACTUAL ALLEGATIONS

9. Defendants design, manufacture, market and sell millions of vehicles within the United States and worldwide.

10. Defendants have branded themselves as manufacturers of safe, dependable, reliable and robust vehicles, having spent millions, if not billions, of dollars on marketing and advertising campaigns to promote the safety, history, reliability, and longevity of their Jeep-branded automobiles, including the Class Vehicles.

### A. Lithium Ion Battery Overview

11. The electric vehicle ("EV") has significantly changed the automobile industry, primarily driven by the rapid development of lithium-ion battery technologies ("LIB").

12. A LIB is the predominant commercial form of rechargeable battery, widely used in portable electronics and electrified transportation.

13. LIBs function by the movement of lithium ions between a positive electrode and a negative electrode through a liquid electrolyte, generating an electrical current when the ions flow from the anode to the cathode during discharge, and reversing the process during charging. To accomplish this, generally, EV batteries are composed of cells, modules, and a pack.

14. Battery cells – the basic unit of a LIB – are connected in a series or parallel to form a battery module. A frame is used to fix the cells together and to protect them from external shocks, heat, and vibrations. The battery pack is the assembly that integrates the modules within the pack infrastructure. This infrastructure, generally, includes structural components, wiring, cooling loops and power electronics. Further, several modules are typically installed with systems that manage power, charging/discharging and temperature. This is typically called the battery management system ("BMS").

15. Currently, there are four common packaging technologies for LIB cells on the market – coin, cylindrical, prismatic, and pouch. Upon information and belief, the Class Vehicles are designed with prismatic cells.



***Figure 1: 2022 Jeep Wrangler 4xe Chassis***

16. Prismatic cells are newer designs that provide thinner geometries and similar or higher capacities than cylindrical cells. The rectangular formant of prismatic cells can also facilitate assembly into the larger battery packs.

17. Unlike cylindrical cells – which are tubular – prismatic LIBs have a flat and often stackable design. These cells are usually enclosed in a sturdy metal casing, generally aluminum alloy, stainless steel, or other like materials.

18. Prismatic cells are often used in EVs, where space efficiency is crucial, as their flat shape allows for better packaging, and because the flat design aids in heat dissipation.

19. Prismatic LIB cells are made up of various components to ensure the movement of lithium ions between a positive electrode and a negative electrode. Namely, this includes necessary components such as cathodes, anodes, and separators.

20. ***Cathodes.*** Cathodes are the positive electrode that is responsible for the LIBs voltage, energy and power densities.

21. LIBs are based on the intercalation and deintercalation of lithium ions. The cathode is the source of the ions inserted into the lattice structure of the anode during charging (intercalation) and extracted from the anode during discharge (deintercalation). A range of cathode materials have been developed that deliver specific levels of performance, though in EVs the two most common are LiCoO2 and LiMn204.

22. A LIB cathode is built on a thin aluminum foil current collector that holds the frame of the cathode coated with a combination of active material, conductive additive, and binder. The active material is the source of the lithium ions. The additive increases the conductivity of the

cathode, and the binder helps maintain the cathode's structure and maintain good contact with the aluminum foil.

23. Different cathode materials contain varying amounts of lithium. Generally, the higher the lithium content, the larger the battery capacity.

24. The cathode is one of the most important components in LIBs. Cathodes limit the performance and are the primary driver of financial cost for these batteries.

25. ***Anodes.*** This is the negative electrode in a LIB where deintercalation occurs.

26. While some LIBs may implement other elements in their anodes, the majority of LIBs on the market use graphite-anodes.[4]

27. Graphite anodes are produced by baking graphite onto a copper foil. These anodes are inexpensive, lightweight, porous, durable, and meet the voltage requirements of most LIB cathode materials.

28. The graphite anode in an LIB is composed of layers with sufficient spacing to allow lithium ions to insert themselves into the graphic matric during charging through a process called intercalation. When the battery is discharged, the ions come out of the graphite matric through a process called deintercalation and flow through the electrolyte and separator to the cathode.

29. The processes of intercalation and deintercalation are the keys to LIB operation. However, if a LIB is charged too quickly, intercalation may not smoothly occur. Instead of penetrating the graphite matric, the lithium ions can aggregate on the surface of the anode, resulting in an effect called 'plating' that has the capability to impair or destroy the cell.

---

[4] This may change in the next ten years, however, as silicon has been found to work well.

30. ***Separator.*** Within the LIB, separators literally separate the anode and cathode to prevent a short circuit. Separators are an essential component to ensuring an LIB operates in a safe and reliable manner. If a separator does not properly function, the entire battery is defective.

31. Modern separator technology also contributes to a cell's thermal stability and safety. Separators affect several battery performance parameters, including cycle life, energy and power density, and overall safety.

32. The separator increases internal cell resistance, and because the separator generally takes up valuable space within the LIB, optimization is an important part of the LIB structure.

33. Separators in LIBs have to be electrochemically and chemically stable relative to the electrolyte and electrode materials since the separator is not part of the oxidation-reduction (redox) reactions that produce the flow of electricity.

34. Separators operate under strongly oxidizing and reducing conditions and must be mechanically sound and able to withstand high stresses during battery assemble and operation.




***Figure 2 Schematic image of a separator in cylindrical LIB cell and a zoomed in cross-section of the layered structure.***

35. LIB separators are complex structures that must satisfy a wide range of performance requirements. For example:

Chemical Stability: the separator must be chemically stable against the electrolyte and electrode materials under the strongly reactive environments when the battery is fully charged.

Thickness and Strength: the separator must be thin enough to support the LIBs energy and power density and have sufficient tensile strength to prevent being stretched or damaged during the winding process. It must not be punctured by particles or structures pressing on its surface to prevent electrical shorting.

Porosity and Pore Size: separators, generally, have a porosity of 40%. If the porosity is larger, it can be difficult to close the pores during a battery shutdown event. The pore need to contain the electrolyte and allow ion movement between electrodes. These pores must be uniformly distributed and have a tortuous structure to ensure uniform current distribution throughout the separator while suppressing lithium growth on the anode.

Thermal Stability and Shutdown: the separator thermally needs to be stable under normal operating temperatures and able to shut down at a temperature slightly lower than the temperature at which thermal runaway occurs.

36. ***Thermal Runaway.*** Concerns associated with EV fires are mostly related to the utilization of a LIB. As EV manufacturers, like Stellantis, pursue greater electric driving ranges and implement more LIBs into their vehicles, they also increase the potential heat released.

37. EV fires can be caused by battery failure. The most common form of failure of a LIB is the thermal runaway. Thermal runaway is a widely observed phenomenon in chimerical and combustion processes, referring to an overheating event in which exothermic chain reactions take place and overcome the cooling systems.

38. In terms of LIBs, thermal runaway usually means a dramatically increasing battery temperature (greater than 10C/min) or the activation of a safety vent, which indicates that exothermic thermochemical and electrochemical reactions have been triggered.

39. In high temperature conditions, some unwanted chemical reactions can occur and result in overheated LIBs. With a poor thermal dispassion ability, it is then possible to trigger a thermal runaway, which can lead to an EV fire. In cold temperatures, the LIBs internal resistance increases. This resistance promotes the growth of metallic dendrites and cause additional heating effects to take place within the battery, which – again – increases the chance of EV fire.

40. Generally, after thermal runaway has initiated, the LIB will release smoke from the safety valve or through cracks in the battery shell. This smoke consists of a mixture of flammable and highly toxic gases. The flammable gases can be ignited by nearby ignition sources, such as fire, sparks, electrical arcs, or even through self-ignition due to a LIBs poor cooling condition. This resulting flame may, and likely will, further heat the battery.

41. If the gas-release rate out of the LIB shell is *lower* than the internal gas-generation rate, the LIB will burst.

42. The safety valve can release some of the accumulated gas that are typically generated during the pre-ignition thermal runaway process, but this valve may not be able to prevent or protect the LIB from external heating, such as flame radiation or a burning battery nearby. In addition, if the released gas is allowed to accumulate in the enclosed LIB and mix with surrounding oxygen, a gas explosion will occur once a pilot source, like a spark or flame, is present.

43. This is significant to the energy release from an EV/LIB battery fire. In general, the heat of combustion for a LIB is one order of magnitude smaller than gasoline. However, because of the small (chemical or electrical) density of the battery, the weight of the EV battery pack is at

least one order of magnitude *larger* than gasoline for an LIB powered EV. In short, a LIB fire has the capability to release 5-10 times more energy of the stored electrical energy of the battery, depending on the LIBs state of charge.

44. The fire risk and hazard of LIBs are particularly serious in EVs, because of high demands in driving performance and charging speed and the increasing scale and energy density of battery packs. EV fires stemming from LIBs are harder to suppress than normal fires because of the potential re-ignition of the LIB and the difficulty in cooling the battery pack inside. In that regard, LIB fires pose an even greater risk of injury and/or property damage. Generally, a significant amount of water is the most effective method to extinguish the fire and cool the LIB.[5]

**B. The Batteries the 2020-2024 Jeep Wrangler 4xe and 2022-2024 Jeep Grand Cherokee 4xe contain the Battery Defect.**

45. All Class Vehicles are equipped with the same or substantially similar LIB.

**Jeep Wrangler 4xe Class Vehicles**

46. The 2020-2024 Wrangler 4xe is designed and equipped with a 17.3-kwh LIB, comprised of 96 Samsung prismatic cells, located underneath the rear passenger seats.[6]

47. In or about October 3, 2024, Stellantis N.V., through their agent FCA US LLC d/b/a Stellantis North America, informed Plaintiff and Class Members that the Wrangler Class Vehicles were designed and built with a LIB that contains cells susceptible to separator damage.

48. Separator damage, combined with other complex interactions within the cells, may lead to vehicle fire.

[5] For example, on October 4, 2024, Windham Connecticut firefighters used "more than 18,000" gallons of water to keep a smoking Jeep Wrangler 4xe from bursting into flames.

[6] https://www.greencarreports.com/news/1129480_2021-jeep-wrangler-4xe-plug-in-hybrid-suv-details-photos-specs-info

49. A vehicle fire can result in increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage.

**Jeep Grand Cherokee 4xe Class Vehicles**

50. The 2022-2024 Grand Cherokee 4xe is designed and equipped with a 17.3-kwh LIB comprised of 96 Samsung prismatic cells, located underneath the vehicle frame.[7]

51. In or about October 3, 2024, Stellantis N.V., through their agent FCA US LLC d/b/a Stellantis North America, informed Class Members that the Grand Cherokee Class Vehicles were designed and built with a LIB that contains cells susceptible to separator damage.

52. Separator damage, combined with other complex interactions within the cells, may lead to vehicle fire.

53. A vehicle fire can result in increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage.

54. The Battery Defect can strand Class Members in all traffic conditions, and the Battery Defect renders the vehicle unusable for its purpose as a hybrid, per voluminous complaints submitted to both the NHTSA and online forums, both of which Defendants monitor to track product performance.

55. The nature and severity of the Battery Defect makes the Class Vehicles especially unreliable, unsafe, and unfit for their ordinary purpose.

56. Plaintiff and Class Members purchased or leased their Class Vehicles for the purpose, and with the understanding, of providing safe, reliable transportation.

57. As a result of the Battery Defect, owners or lessors of Class Vehicles must not charge their vehicles, maintain a charge percentage of 0% and park their Class Vehicle outside and

[7] https://www.greencarreports.com/news/1135627_2022-jeep-grand-cherokee-4xe-test-drive-review-price-specs-photos-info

away from any and all physical structures, or else risk a vehicle fire – potentially causing or incurring serious bodily injury and/or property damage – every time they drive or park the Class Vehicle at any residence, public space, or otherwise.

58. The Battery Defect substantially impairs the use, value and safety of the Class Vehicles and renders them substantially less drivable, safe, useful and valuable than they would be without the Battery Defect.

59. Defendants have also failed to implement an appropriate recall for the Class Vehicles to remedy the Battery Defect, despite its serious and life threatening risks, and likely has not done so in the interest of corporate profit. Rather, Defendants have released a software update to the Class Vehicle so the onboard computer can merely identify when the LIB is subjected to the Battery Defect. The current Battery Defect recall does not remedy the separator issue, leaving owners and lessors directly in harm's way. In short, Defendants do not cure the Battery Defect, but instead merely tell owners and lessors that they are "safe" once the updated onboard computer system can notify them that their Class Vehicle will spontaneously combust due to the Battery Defect.

60. Defendants' failure and inability to adequately remedy the Battery Defect and advice to Plaintiff and Class Members to stop charging their Class Vehicles and avoid parking near any physical structures, leaves Plaintiff and Class Members, vehicle occupants, and others of seriously bodily harm and even death.

61. Not only do Defendants fail to properly remedy the Battery Defect, but they do not compensate Plaintiff and Class Members for their overpayment or diminished value of their Class Vehicles.[8]

**C. Stellantis Obtained Pre-Sale Knowledge of the Battery Defect from Various Sources.**

62. Defendants knew about the Battery Defect through a prior recall, consumer complaints made directly to Defendants, NHTSA, and/or posted on public online vehicle owner forums.

**Prior Recall NHTSA 23V-787**

63. In November of 2023, Defendants issued a voluntary recall of certain 2021-2023 Jeep Wrangler PHEVs that may have a high voltage battery which may fail internally and could lead to a vehicle fire with the ignition on or off.

64. The batteries were manufactured by Samsung SDI America Inc.

65. Defendants acknowledge that a vehicle fire can result in increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage.

66. Defendants advised customers to reframe from recharging the vehicles and not to park them inside of buildings or structures or near other vehicles.

67. Defendants admitted that the defect had not been identified and the root cause was still being investigated at the time the recall was issued.

68. Defendants proposed remedy was a Remedy will be a software flash and replacement of the HV battery pack if needed.

---

[8] For reference, the 2024 Jeep Wrangler starts at $32,095 MSRP, and the 2024 Jeep Wrangler 4xe has a starting MSRP of $49,995. Disregarding the potential physical harm that Plaintiff and Class Members are subjected to, they also spent $17,900 more than they would have had if they purchased the non-electric Jeep Wrangler. Similarly, a 2024 Grand Cherokee starts at $37,035 MSRP, while the 2024 Grand Cherokee 4xe starts at $60,490 MSRP – a difference of $23,455.

## NHTSA Complaints

69. Another source of Defendants' knowledge are the complaints submitted by their customers to the National Highway Traffic Safety Administration ("NHTSA"). Defendants monitor customer complaints submitted to the NHTSA pursuant to the TREAD ACT. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000). Defendants knew or should have known about the Defect and its associated risks through the numerous consumer complaints filed with NHTSA as early as March 2021.

70. Examples of complaints submitted to NHTSA reflecting the Battery Defect are copied below.[9]

**Model/Year** 2021 Jeep Wrangler 4xe
**NHTSA ID:** 11403621
**Incident Date:** 3/16/2021
**Report Date:** 3/18/2021
**Location:** Rumson, New Jersey
**VIN Number:** 1C4HJXENXMW

**Description**

OUR 2021 JEEP STARTED SMOKING IN THE ENGINE AND WITHIN 10 MINUTES BURST INTO FLAMES. THE ENTIRE FRONT END WAS DAMAGED BEYOND REPAIR / BURNED AND FIRE STATIONS HAD TO PUT OUT THE FIRE. MY DAUGHTER, DOGS AND I WERE ABLE TO MAKE IT OUT OF THE CAR BUT VERY SCARY.

---

**Model/Year** 2021 Jeep Wrangler 4xe
**NHTSA ID:** 11436759
**Incident Date:** 9/27/2021
**Report Date:** 10/14/2021
**Location:** Bellingham, Washington
**VIN Number:** 1C4HJXCN3MW

**Description**

The engine caught on fire after a short drive. The fire burned the entire top of the rear of the engine and completely through the wiring harness before I could extinguish it with a fire extinguisher and water. The fire appears to have started at the top rear of the

[9] All NHTSA complaints cited herein are verbatim copies of the complaints accessible on NHTSA's website. All typographical and grammatical errors are original.

engine where the fuel line enters the intake. The manufacturer, Stellantis, hired a special investigator from EAA/Bosch to look at it, and he agrees that it is similar to fires in similar engines that were recalled in October 2020, NHTSA Campaign number 21V-665. Stellantis has not responded to repeated requests for resolution.

---

**Model/Year** 2023 Jeep Wrangler 4xe
**NHTSA ID:** 11540332
**Incident Date:** 8/16/2023
**Report Date:** 8/23/2023
**Location:** Jackson, Mississippi
**VIN Number:** 1C4JJXN60PW

**Description**

The contact's daughter owned a 2023 Jeep Wrangler Hybrid. The contact stated while his daughter was driving 30 MPH, the vehicle ahead of hers stopped unexpectedly. The contact stated that the daughter slammed on the brakes and swerved to the right; however, the driver's side front end of the vehicle hit the passenger's side rear end of the other vehicle and damaged its taillight. The air bags did not deploy. The contact stated that it was a fender-bender. The contact's daughter then noticed smoke coming from underneath the hood of the vehicle. The contact's daughter immediately exited the vehicle and contacted emergency services. The vehicle caught on fire and burned significantly. The fire was extinguished by the fire department. The contact was unsure whether a fire department report was filed. A police report was filed. The contact's daughter did not sustain any injury. The vehicle was towed to a tow lot, where it was totaled. The dealer and the manufacturer were not notified of the failure. The failure mileage was 2,077.

---

**Model/Year** 2021 Jeep Wrangler 4xe
**NHTSA ID:** 11570607
**Incident Date:** 1/6/2024
**Report Date:** 2/7/2024
**Location:** Layton, Utah
**VIN Number:** 1C4JJXFM2MW

**Description**

Fire started about 15 minutes after parking the Jeep. Flames and smoke first appeared in engine compartment on passenger side where an electrical panel is located. Fire spread quickly and burnt out entire front of vehicle before the fire department was able to extinguish the flames. Vehicle is a total loss.

---

**Model/Year** 2022 Jeep Wrangler 4xe
**NHTSA ID:** 11605154
**Incident Date:** 7/23/2024
**Report Date:** 7/29/2024

**Location:** Decatur, Texas
**VIN Number:** 1C4JJXP61NW

**Description**

Jeep was parked. Charging. Neighbors ran over to tell us they saw it smoking. Electric battery ignited. Jeep caught on fire. Took 3 hours to get jeep cooled enough to tow it away. Electric battery was still at 180┬░ when towed.

---

**Model/Year** 2023 Jeep Wrangler 4xe
**NHTSA ID:** 11621134
**Incident Date:** 9/3/2024
**Report Date:** 10/21/2024
**Location:** Cupertino, California
**VIN Number:** 1C4JJXP66PW

**Description**

[XXX] [XXX] [XXX] [XXX] Oct 21 2014 National Highway Traffic Safety Administration (NHTSA) 1200 New Jersey Avenue, SE West Building Washington, DC 20590 Subject: Urgent Safety Concern and Financial Loss Related to 2023 Jeep Wrangler Sahara 4xe ΓÇô VIN: [XXX] ] Dear NHTSA, I am writing to formally report a significant safety concern and financial hardship I have experienced as a result of owning a 2023 Jeep Wrangler Sahara 4xe, VIN: [XXX] ]. On [XXX], while the vehicle was charging at [XXX], it caught fire. The vehicle had no pending services or recalls at the time of the incident. To my further dismay, in October 2024, Jeep issued a global recall for this model, citing battery issues. This only confirms my suspicion that the fire in my vehicle was the result of a manufacturing defect. Given the timing of the recall, I believe my incident is directly related to this defect, and the issue raises significant safety concerns. The total cost of my vehicle was approximately $78,454, and I have only driven it for about 15,000 miles. After filing an insurance claim, I was offered $45,215, which does not adequately cover the financial loss I have incurred. This leaves me at a significant financial deficit. Additionally, I have been renting a car for the last six weeks due to this incident, which has further cost me approximately $36,000. I have contacted Jeep's customer support and created a case (number: [XXX]), but despite my efforts, I have yet to receive any meaningful response or resolution from Jeep. This situation has caused not only significant financial strain but also immense mental stress. I urge the NHTSA to investigate this issue thoroughly and ensure that Jeep takes responsibility for their defective vehicles. I am seeking compensation that appropriately reflects the financial losses I have suffered, ideally in the form of either a replacement INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

---

**Model/Year** 2022 Jeep Wrangler 4xe
**NHTSA ID:** 11621193
**Incident Date:** 10/21/2024
**Report Date:** 10/22/2024
**Location:** San Francisco, California

**VIN Number:** 1C4JJXSJ6NW

**Description**

The contact owns a 2022 Jeep Wrangler. The contact stated that the vehicle was parked outside the residence for 5 days when a neighbor called to make him aware the vehicle was on fire. The contact was not at the residence at the time of the fire however 911 was called to arrive at the residence. Upon arrival at his residence, the fire department was present and had extinguished the fire. The fire department stated that the fire was not arson-related and the origin was electrical. A fire report was filed. The vehicle remained at the residence at the contact possession. The sidewalk and the street were damaged due to the fire. No injuries were reported. A dealer was not contacted. The vehicle was not diagnosed or repaired. The manufacturer was not made aware of the failure. The failure mileage was 10,000.

---

**Model/Year** 2023 Jeep Grand Cherokee 4xe
**NHTSA ID:** 11622712
**Incident Date:** 10/10/2024
**Report Date:** 10/30/2024
**Location:** Virginia Beach, Virginia
**VIN Number:** 1C4RJYD64P8

**Description**

On 10/10/2024, my Jeep Grand Cherokee 4xe (hybrid) had a battery fire at my home. Luckily, the fire department got it controlled before any additional property or any people were harmed, but under slightly different circumstances (middle of the night or parked in the garage) the house would have burned and my entire family could have been killed. After this incident, I read that Jeep/Stallantis issued a recall for this issue 10/1, but no timely attempt to contact owners was made. The guidance is that these vehicles should not be charged and should not be parked near buildings. Knowing this could have prevented this and any other similar fires, but I did not receive notification of the recall until 10/21 by mail. I receive emails from Jeep/Mopar weekly for useless information such as extended warrantees, so immediate notification should be simple. In fact I even made an appointment for an oil change on the same day as the fire and after a search for recalls, I was given NO information about this. Jeep is now investigating the incident, but Stellantis will not provide me additional information and this process may take months. I am now paying out of pocket for a rental car and still must pay the loan for a car that is totaled. Stellantis should be providing a car in the meantime and replacing my car (in a non hybrid model) as soon as possible, but no one has even contacted me to make sure everyone is ok. They should also be notifying owners affected by the recall by every means possible in order to prevent further damage to property and human injuries or even deaths.

71. The above complaints are just a small sampling of those submitted to the NHTSA. For additional complaints, please refer to Exhibit A. For the Court's convenience, Exhibit A has been limited to the first forty-two (42) pages of NHTSA complaints.

72. While the numerous reports to the NHTSA about Defendants' Battery Defect is significant, the number of NHTSA complaints must be understood as a mere fraction of the reports and complaints related to the Battery Defect Defendants received and were otherwise aware of starting soon after the first Class Vehicles' sold.[10] This is so because NHTSA complaints are only a fraction of the number of complaints actually made by consumers, who are generally more inclined to go to websites hosting vehicle owner forums, or directly to Defendants' dealership or to Defendants themselves when components fail.

**Online Consumer Complaints**

73. Defendants also knew, or should have known, about the Battery Defect and its severe risks through the numerous consumer complaints submitted on various online forums.

74. Online reputation management (commonly called "ORM" for short) is now a standard business practice among most major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products. "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation."[11] The growth of the internet and social media and the advent of reputation management companies have led to ORM becoming an integral part of many companies', including Defendants', marketing efforts.

---

[10] In fact, Defendants were aware of the issue with this specific battery prior to the release of the Grand Cherokee 4xe in 2022. Defendants, knowing the battery was defective, still forced the battery into a new line of vehicles in the name of profitability.

[11] Moryt Milo, *Great Businesses Lean Forward, Respond Fast*, SILICON VALLEY BUSINESS JOURNAL (September 5, 2013), http://www.bizjournals.com/sanjose/print-edition/2013/05/17/great-businesses-lean-forward-respond.html

75. For example, on April 21, 2021, one Class Member made the following post regarding the "Service Charging System" alert message. Notably, the official Jeep account for the forum– Jeep Cares – commented.[12]

> K
> **Kevern**
> 9 posts · Joined 2021
>
> #9 · Apr 21, 2021
>
> Broken down right now. Came to a halt at an intersection as I was taking a right. Forward collision avoidance and wouldn't move.
> Pushed it and rolled downhill to a parking lot. Sitting in a space waiting for the tow to the dealer.
> Service Charging System is the alternating message, with the red battery light (to the right of the tach) and power plug illuminated.
>
> I was in Electric mode when it all happened. Horrible sounds as everything kind of locked up.
>
> Seems pretty major. 93 miles, bought 3 days ago...
>
> AMK, NeverBuyJeepAgain, StuckNLasVegas and 1 other person
>
> Reply Like
>
> > Jeep
> > **JeepCares**
> > 708 posts · Joined 2021
> >
> > #10 · Apr 21, 2021
> >
> > Hi @Kevern,
> >
> > Please send us a private message with your VIN, mileage, and dealer. We want to ensure that you have support while your Jeep is at the dealer.
> >
> > Darlene
> > Jeep Cares

76. Similarly, on April 25, 2021, another Class Member posted the following to the same web forum, which garnered 108,000 views.

---

[12] In fact, Jeep Cares has commented on the 4xe Forum over seven hundred (700) times. For reference, please see Exhibit B.

Charging system error that caused engine to shutdown → Jump to Latest

108K views 439 replies 115 participants last post by Gwmccrory 4d ago

RubiXe Discussion starter
15 posts · Joined 2021

#1 · Apr 25, 2021

Ok so pretty major issue popped up with the 4XE this afternoon.
Driving on 95N in esave when the engine just cut out and RPM went down to zero. Display had the red electric charge symbol with a message "Service charge system now" and "Place car in park" with the Drive showing a flashing D. We coasted the JL over to the shoulder. Place the JL car in park and then it went back to the standard "push start and press the brake". Thank heavens JL started back up. Interestingly the "Service charge system" is for when you car is in park and is actively charging with the recommendation to unplug and plug back in your Echarger. Guess it's a trip to the dealership Monday. Jeep was picked up from the dealership on April 17th. Will update once we hear from Wrangler, but have a sinking feeling it won't be a fast turn around 🙁

Mike the millwright and Venjack

Reply Like

77. Class Members also posted concerns on Social Media sites. For example, on June 9, 2021, one Class Member made the following post regarding their Jeep Wrangler 4xe to one of the largest Jeep 4xe Facebook groups.

Michael Caputo
June 9, 2021 ·

I've been on the side of extension cords, properly sized and short as possible are ok. But this is the plug of my 12 awg, 15 foot extension cord. I've used it for 2 years. Most of that was charging a Subaru crosstrek which only took 5.5 hours. I've been charging the jeep and the crosstrek with it for the past couple months. All of that is 110v charging. I have no idea when this over temp situation occurred. Could have been a day or a year ago. It was still working fine.

Net net, I don't like the risk after seeing this and am investing in a 50 amp 220 circuit with an outlet close enough to the cars.



20 30 comments

Like Comment Send

78. As a further example, below is a forum post from September 17, 2021.



4xeJeepDad
First Name: Colin
Joined: Sep 17, 2021
Threads: 1
Messages: 3
Reaction score: 2
Location: Fort Mill, SC
Vehicle(s): 2021 Jeep Wrangler RUBICON JLU 4XE

Sep 17, 2021 Thread starter #1

I had seen posts on this and was somewhat dismissive as I thought there's no way it would happen to me. There are a little over 2,000 miles on my 4xe. I was idling and started a left hand turn onto a busy road, under 30 mph, suddenly the dash lit up, all power to the wheels stopped and I rolled to a complete stop with cars coming up behind me at a fast pace with zero time to put on hazards. The MIL light came on and dash flashed a charge fault message. After about five minutes of trying to hit the start button, I was able to get power back to the wheels and made my way home. Now it has my attention and am scared to death this would happen on a freeway or an even more dangerous situation. Scheduled with Jeep Service (earliest available next week). BTW - MIL light is now off and all appears normal (as others have reported). State of the vehicle (for clarity) - <1% battery, in hybrid mode, 1/2 tank of gas, no ACC, no CC, standard accelleration.

79. Class Member complaints have remained consistent over time. On December 21, 2024, one Class Member made the following post regarding the Jeep Wrangler 4xe 95B recall.[13]

r/4xe · 5 days ago
Any-Hour7166

**Be careful out there!**

Just a friendly reminder to anyway who hasn't went in for the recall yet.



63 34 Share

## Warranty Data

[13] Plaintiff's Counsel accessed this post on 12/26/24 at 11:16 AM. The post indicates it was posted "5 Days Ago" from the date of access.

80. Defendants also knew about the Battery Defect from its warranty data. Per the TREAD Act, Defendants track vehicle diagnoses and repairs from dealership technicians in a single, aggregated database. Defendants employ people who monitor the database for repair trends, and engineering and management staff review such trends in regular meetings. For every one complaint filed with the NHTSA, Defendants likely receive hundreds or thousands of related warranty claims. Accordingly, Defendants have likely received hundreds or thousands of Battery Defect warranty claims.

81. Despite Defendants' knowledge of the serious safety risks the Battery Defect causes in the Class Vehicles, it has failed to provide an adequate repair to all Class Vehicles.

**D. Stellantis Actively Concealed and Made Misleading Partial Disclosures, Which Create a Duty to Disclose.**

82. Despite their pre-sale knowledge of the Battery Defect, Stellantis knowingly manufactured, marketed, and sold the Class Vehicles and their defective Batteries while willfully concealing the Battery Defect from Class Members and Plaintiff.

83. Stellantis omitted material facts related to the standard, quality or grade of the Class Vehicles. Specifically, Stellantis omitted the fact that the Battery in the Class Vehicles is defective and prone to premature failure and subsequent risk of fire, exposing drivers, occupants and members of the public to severe safety risks. Due to Stellantis's conduct, Class Members and Plaintiff have suffered actual damages.

84. Stellantis owed a duty to disclose the Battery Defect and its corresponding safety risk to Plaintiff and Class Members because Stellantis made non-puffery, partial material statements about the Class Vehicles, possessed superior and exclusive knowledge regarding the Defect and the risks associated with the Batteries failure, and falsely and misleadingly marketed Class Vehicles.

85. Stellantis held out the Class Vehicles as having superior engineering and performance, despite its knowledge that the Battery Defect represented a flaw that rendered the Class Vehicles short of industry standards for engineering, and substantially impaired the Class Vehicles' performance and life expectancy.

86. Defendants jointly developed the sales and marketing materials, including on the Jeep website, which did not include any references to or notice about the Battery Defect. Stellantis's concealment of the Battery Defect in light of the partial disclosures made in their marketing and sales material render those partial disclosures misleading and false.

87. Stellantis actively required dealerships to continue to sell the Class Vehicles, up to the point the recall was issued, even though the vehicles contained the potentially life threatening Battery Defect.

88. This sales practice was successful as exemplified by the below NHTSA complaint.

| | |
|---|---|
| **NHTSA ID:** | 11518374 |
| **Incident Date:** | 3/24/2023 |
| **Report Date:** | 4/21/2023 |
| **Location:** | Toledo, Ohio |
| **VIN Number:** | 1C4JJXP66PW |

**Description**

This vehicle was sold unlawfully to me, with an open recall on it. I purchased the brand-new vehicle from Sterling Heights Dodge, Chrysler Jeep New car dealership on 3/23/23. I got at open of business 9am left shortly after 11am with the new car.3/24 The vehicle engine lights came on, RPM's were revved high, engine was making loud noises. I called the dealership to make an appointment with service, I was told I can't bring my car there for service it had to go to Toledo Service Dept Grogan the closest to me. I was told to drive it as is it would be fine. On 3/26 my vehiicle abruptly stopped in heavy traffic with my 5 year old grandson in the backseat. Nothing worked, all power was dead. I have videos of this. I had to get out and motion for traffic to go around us, several time we were almost hit. The car was towed to Grogan they got it in for service 3/28. It was discovered by the service manager on 3/23 when I purchased my new car that New car had an open recall on it launched 3/14/23, and the dealership entered 3/23/23 as the repair date to bypass the system because you can't sell a brand new car with an open recall. The car is dangerous, it has been sitting in service since 3/28 until present date totally disabled without ability to be fixed by Grogan experts. The car was unlawfully sold, **it was not disclosed there was a open recall or I would have opted to buy a different car.** The

> car is a lemon they will not take the car back although it was sold unlawfully New Cars are forbidden to be sold with open recalls, and open recalls are to be disclosed prior to selling consumers cars. It is going to cause a very serious accident with injuries and potentially even fatality.[14]

89. In its 2021 Jeep Wrangler 4xe Press Release,[15] Stellantis touted the Class Vehicles ability to control battery temperature, but never disclosed the Battery Defect:

> Encased in an aluminum housing, **the pack is fitted with a dedicated heating and cooling circuit to keep the battery at its optimum temperature for best performance**. The temperature control circuit includes a dedicated heater unit and a chiller that uses the Wrangler air conditioning refrigerant to reduce coolant temperature when needed.

90. Notably, even after being put on notice by Class Members of the Battery Defect, Stellantis continues to tout the Class Vehicles as being the "most capable ever." For example, in January of 2024, Stellantis ran the following advertisement for the 2024 Jeep Wrangler 4xe.[16]




[14] Emphasis added.
[15] *Press Kit: 2021 Jeep Wrangler 4xe, Stellantis North America* (September 3, 2020) https://media.stellantisnorthamerica.com/newsrelease.do?id=22673&mid=1 (last accessed January 4, 2024).
[16] *'2024x4' Jeep TV Spot* (January 3, 2024), available at https://www.ispot.tv/ad/53EF/jeep-4xadventure (last accessed January 4, 2025).

91. Plaintiff and Class Members saw or heard these partial statements – or statements Stellantis made or caused to be made substantially similar to these – quantifying the Class Vehicles' operation specifications as part of their marketing efforts. Stellantis's partial statements caused Plaintiff and Class Members to purchase the Class Vehicles without full knowledge of the Battery Defect. Plaintiff and Class Members placed their trust in Stellantis to give them all the details necessary to make an informed purchase decision, but Stellantis provided only partial disclosure of facts basic to the transaction – *i.e.,* Stellantis failed to disclose that the Class Vehicles contained the Battery Defect.

92. Stellantis's detailed partial statements about the capabilities of the Class Vehicles, including, but not limited to those set forth above, were available to Plaintiff and consumers – putative class members – on, *inter alia*, Stellantis's website and in popular and relevant online websites that reported news about Stellantis's Jeep Wrangler 4xe and Grand Cherokee 4xe in 2021 (and through the present) prior to Plaintiff's purchase of his Class Vehicle. The same partial statements are still on the internet today, fully accessible to those Class Members who purchased or leased their used Class Vehicles later in time than Plaintiff Fishon, or consumers who purchased or leased their vehicles even more recently, or even those who are currently planning to purchase or lease a used Class Vehicle. Stellantis has not removed the misleading partial statements, or clarified them, or disclosed the Battery Defect.

93. As a result of Stellantis's failure to disclose to Plaintiff and Class members the material fact that the Battery in the Class Vehicles is defective and prone to premature failure and the risk of fire, owners and lessors of the Class Vehicles are required to spend thousands of dollars repairing or replacing the Battery or selling their vehicles at a substantial loss.

94. Stellantis also owed a duty to disclose the Battery Defect and its corresponding safety risk to Plaintiff and Class Members because Defendants made misleading and/or ambiguous partial statements about the nature and quality of the Batteries installed in the Class Vehicles, and Plaintiff and Class Members reposed trust in Stellantis to provide full and complete information or otherwise to correct incomplete or misleading partial statements. Moreover, based on its knowledge of the Battery Defect, Stellantis has exclusive knowledge was in a superior position vis-à-vis Plaintiff and Class Members to make their incomplete and partial statements about the Batteries true and complete.

95. Premature failure of the Battery is material because no reasonable consumer expects that he or she will have to spend thousands of dollars for diagnosis, repair or replacement of the Battery before the end of the expected life of the vehicle. Additionally, no reasonable consumer purchasing a hybrid vehicle expects that they will be barred from charging the vehicle, using its electric capabilities, or parking it near their residence or other structures for fear of vehicle fire. Plaintiff and Class Members had a reasonable expectation that the vehicles would not suffer from a premature failure of the Battery.

96. Premature failure of the Battery is also material because it presents a significant safety risk and places the driver, occupants and members of the public at risk of serious injury or death. Drivers and occupants of the Class Vehicles, as well as the public, are at risk both while in the vehicle or while near the vehicle. Additionally, Drivers, occupants of the Class Vehicle, and other drivers on the road, are at risk of serious accidents or being stranded in the middle of the road when the vehicle abruptly suffers catastrophic failure or spontaneously combusts.

97. Plaintiff and Class Members reposed trust and confidence in Stellantis. In their respective purchase transaction, Plaintiff lacked any knowledge of the Battery Defect while

Stellantis knew about the Defect and the Defect's implications for the use and enjoyment of the Class Vehicles, not to mention their value. Under these circumstances, based on the nature of the dealings, including Stellantis's partial disclosures and the vast difference in knowledge of the Battery Defect between Plaintiff and Stellantis, Stellantis had a duty of full disclosure.

98. Had Stellantis disclosed the existence and extent of the Battery Defect, Plaintiff and Class Members would not have purchased the Class Vehicles or would have purchased them for a far lower price.

99. Stellantis also knowingly concealed the Battery Defect from Plaintiff and other Class Members after their purchase by not replacing the defective battery – instead opting to update software so Plaintiff and other Class Members purportedly would be notified before their Class Vehicle suffered catastrophic failure or spontaneously caught fire.

100. Stellantis also knowingly repurposed the defective Batteries from the 2020-2021 Jeep Wrangler 4xe models into the 2022-2024 Grand Cherokee 4xe models while on adequate notice of the severe Battery Defect present in those batteries.

**E. Stellantis's Warranty Terms Are Unconscionable.**

101. Stellantis provided Plaintiff and Class Members with one or more express warranties in connection with the purchase or lease of the Class Vehicles.

102. Under the express warranties, Stellantis, at a minimum, warranted each Class Vehicle for 36 months or 36,000 miles, whichever occurred first. Stellantis placed this limitation in the warranty despite its knowledge of the Battery Defect.

103. Stellantis warranted to the original and each subsequent owner of a Class Vehicle that any authorized Jeep dealership would make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period.

104. Stellantis omitted from the owners' manuals, warranty and maintenance guides for the Class Vehicles any reference to the Battery Defect or any description of the problem – that is, the equipped LIB contains a separator defect that potentially subjects the vehicle to catastrophic failure, including spontaneous vehicle fire.[17]

105. Notwithstanding the fact that the Battery should operate normally in vehicles for the ordinary expected life of the vehicle, on information and belief, Stellantis has refused to repair or replace the Battery outside of the time periods covered by the manufacturer's warranties. Additionally, on information and belief, Stellantis has refused to replace the Class Vehicles defective LIB after failure, requiring Class Members to pay for a new LIB out of pocket. Thus, Defendants have wrongfully and intentionally transferred the cost of repair or replacement of the Battery to Plaintiff and Class Members by fraudulently concealing the existence of the Battery Defect, which Defendants know will typically occur within hours of driving the vehicle off the lot, or within the first few months of ownership, or shortly after the expiration of the warranties.

## III. PARTIES

### A. Plaintiff

106. Plaintiff and every Class Member has suffered an ascertainable loss due to Stellantis's omissions regarding the Class Vehicles, including, but not limited to, out-of-pocket loss and the diminished value of the Class Vehicles.

---

[17] While Stellantis generally does describe the risk of vehicle fire stemming from battery failure, they fail to indicate that the batteries equipped in the Class Vehicles are subject to a defect that greatly increases the likelihood of such failure. Additionally, Stellantis notifies consumers that they may only use ABC, BC or C fire extinguishers to put out potential vehicle fires, however Stellantis does not include any of these fire extinguishers with purchase, nor do their dealerships sell them. Instead, only a mount is provided for the consumer to place their own fire extinguisher. In short, Stellantis knows that these vehicles are at a heightened risk for vehicle fire and yet fails to provide the consumer with an adequate remedy to protect themselves and those around them.

107. Neither Stellantis, nor any of their agents, dealers, or other representatives informed Plaintiff or Class Members of the Defect before their purchases of the Class Vehicles.

108. Plaintiff received information about the Class Vehicles at Jeep authorized dealerships and/or through Jeeps' marketing and advertising concerning the lifecycle, use duration, efficiency, reliability, quality and safety, as intended by Stellantis. None of the information Plaintiff received disclosed the Battery Defect before his Vehicle's purchase.

**Eric Fishon**

109. Plaintiff Eric Fishon is a resident of Hauppauge, New York.

110. On or about July 11, 2022, Mr. Fishon bought a new 2022 Jeep Wrangler 4xe (VIN 1C4JJXR67NW237283) from an authorized Jeep dealership, Southampton Jeep in Southampton, New York for $66,717.47.[18]

111. Before purchasing his Class Vehicle, Mr. Fishon performed research about the safety, use, efficiency, and reliability of the Class Vehicle, including visiting the Stellantis and Jeep websites. Mr. Fishon observed Stellantis' and Jeeps' descriptions of itself as a builder of high-quality and safe vehicles. Mr. Fishon was aware of Jeeps' representations, as set forth herein, from visiting Jeeps' website and other internet-based news sources featuring information about the Class Vehicle that included specific details about, *inter alia*, the useful life of the Class Vehicle and their emissions efficiency, torque and output.

112. At no time before Mr. Fishon's purchase of his Class Vehicle did Jeep inform him of the Battery Defect.

113. Mr. Fishon relied on Defendants' marketing statements, and material omissions, regarding the Battery Defect when purchasing his Class Vehicle and would not have purchased it

[18] Plaintiff Fishon traded in a vehicle valued at $30,804.

or paid a premium price for it if he knew about the Battery Defect and the related safety and reliability issues.

114. In or about October 2024, Mr. Fishon was notified by Defendant that his Class Vehicle was impacted by the Battery Defect. As a result, Mr. Fishon could no longer charge his Class Vehicle, nor keep the Class Vehicle in or near his residence.

115. Mr. Fishon lives in a small community with assigned parking spots near the residences. Additionally, the Home Owners Association for his community has an outstanding ban on street parking. Thus, to properly adhere to the terms of the recall, Mr. Fishon must park his car in a lot far away from his residence. This is troublesome for Mr. Fishon as his young child suffers from various disabilities and journeying to the far lot on a daily basis is difficult for his child.

116. Mr. Fishon specifically purchased his Class Vehicle because it comes equipped with battery powered, automatic step up bars to assist passenger entry into the vehicle. This was necessary for Mr. Fishon because his child suffers from various disabilities, which make it difficult entering and exiting vehicles without this feature.

117. Due to the Battery Defect, Mr. Fishon is unable to properly use the step up bars due to the fear of potential electrical and/or fire damage injuring his child.

118. Additionally, Mr. Fishon's child is aware that the Class Vehicles are known to catch fire and is incredibly worried about dying while in the vehicle.

119. Mr. Fishon has incurred costs and expenses associated with the Battery Defect in that he must pay for more gas instead of relying on the vehicles electric capabilities.

120. Defendants never disclosed the Battery Defect to Mr. Fishon before he purchased the Class Vehicle, despite their exclusive knowledge of the Defect, so he purchased it on the reasonable, but mistaken, belief that the Vehicle, including the Battery powering it, was reliable.

121. Mr. Fishon reasonably expected that his Class Vehicle was without defect, and would not have bought the Class Vehicle, or paid considerably less for the vehicle, had he been aware of the Battery Defect.

**B. Defendants**

**Stellantis N.V.**

122. Defendant Stellantis N.V. is a global automaker and mobility provider which is engaged in designing, engineering, manufacturing, marketing, distributing and selling vehicles, components and production systems worldwide. Stellantis N.V. designs, engineers, manufactures, markets, distributes and sells vehicles across five portfolios: (i) luxury vehicles under the Maserati brand; (ii) premium vehicles covered by Alfa Romeo, DS and Lancia brands; (iii) global sport utility vehicles under the Jeep brand; (iv) American brands covering Dodge, Ram and Chrysler vehicles and (v) European brands covering Abarth, Citroën, Fiat, Opel, Peugeot and Vauxhall vehicles. Stellantis N.V. centralizes design, engineering, development and manufacturing operations, to allow it to efficiently operate on a global scale, including in the state of New York. Stellantis N.V. supports its vehicle shipments with the sale of related service parts and accessories, as well as service contracts, worldwide.[19]

123. Defendant Stellantis N.V. was incorporated as a public limited liability company under the laws of the Netherlands in April 2014 under the name Fiat Chrysler Automobiles N.V.

124. In its current configuration, Stellantis N.V. is the result of the merger between Fiat Chrysler Automobiles and Peugeot S.A., each of which were leading independent global automotive groups prior to the merger.

[19] https://www.stellantis.com/content/dam/stellantis-corporate/investors/financial-reports/Stellantis-NV-20231231-Annual-Report.pdf

125. Defendant Stellantis N.V. principal office is located at Taurusavenue 1, 2132LS, Hoofddorp, the Netherlands (telephone number: +31 23 700 1511). Its agent for U.S. federal securities law purposes is Christopher J. Pardi, c/o FCA US LLC, 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

**FCA US LLC d/b/a Stellantis North America**

126. FCA US LLC d/b/a Stellantis North America ("Stellantis NA", collectively with Stellantis N.V., "Stellantis") and known historically as Chrysler, is one of the big three automobile manufacturers in the United States.

127. Defendant Stellantis NA is the wholly owned American subsidiary of Stellantis.

128. Defendant Stellantis NA sells vehicles worldwide, including throughout the United States and in the state of New York, under the Chrysler, Dodge, Ram Truck and Jeep nameplates.

129. Defendant Stellantis NA principal office is located at 1000 Chrysler Drive Auburn Hills, Michigan 48326-2766.

## IV. JURISDICTION

130. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs, and minimal diversity exists. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

131. This Court has specific personal jurisdiction over each Defendant because Stellantis has purposefully availed themselves of the privileges, benefits and protections of this District by continuously and systematically conducting substantial business in this District. Stellantis, itself and/or through its subsidiaries or agents, transacts business within the State of New York and/or

contracts anywhere to supply goods or services in New York while obtaining substantial revenue in New York, including by marketing, and selling the Affected Vehicles, as well as other products in New York and providing repair services to the Affected Vehicles, and has injured Plaintiff and Class Members in New York.

132. Stellantis N.V. designed, manufactured, marketed and sold the Class Vehicles.

133. Stellantis N.V. specifically targeted the U.S. market for the sale of its vehicles and is responsible for ensuring that its vehicles comply with all applicable federal and state regulations.

134. Stellantis NA is the agent/alter ego of Stellantis N.V. due to its exclusive importer and distribution agreement with its parent company, shared leadership and ownership structures, and the fact that Stellantis NA must comply with the directions of Stellantis N.V., including shared finances, branding, marketing, and communications.

135. Stellantis N.V. thus exercises control over Stellantis NA's U.S. based activities.

## V. VENUE

136. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District where Stellantis authorizes dealers in this District, advertises in this District, and profits from its activities and conduct within this District.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery Rule Tolling

137. Class Members did not know and could not know about Stellantis's deception concerning the Battery Defect in the Class Vehicles.

138. Within the time period of any applicable statutes of limitation, Plaintiff and other Class Members did not know of the Battery Defect and could not have discovered through the

exercise of reasonable diligence that Stellantis was concealing the Battery Defect in the Class Vehicles and misrepresenting the safety, quality, and reliability of the Class Vehicles.

139. Plaintiff and the other Class Members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Stellantis did not report information within their knowledge to federal and state authorities, dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Stellantis had concealed information about the true nature of the Battery Defect in the Class Vehicles, which was discovered by Plaintiff only shortly before this action filed. Nor, in any event, would such an investigation on the part of Plaintiff and other Class Members have revealed this information given the nature of the defect and due to Stellantis's concealment and misrepresentations.

140. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule for the claims asserted herein.

**B. Fraudulent Concealment Tolling**

141. All applicable statutes of limitation also have been tolled by Stellantis's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

142. Despite Defendants knowledge, rather than disclose the existence of the Battery Defect at the time of purchase, Defendants falsely represented that the Class Vehicles were safe, dependable, reliable, and of high quality.

143. Defendants were under a duty to disclose the Battery Defect due to their exclusive and superior knowledge.

144. Defendants also were under a duty to disclose the Battery Defect to correct the partial and misleading representations that the Class Vehicles were safe, dependable, reliable and of high quality.

**C. Estoppel**

145. Defendants were under a continuous duty to disclose to Plaintiff and the other Class Members the true character, quality, and nature of the electrical system, specifically as related to the Battery in the Class Vehicles.

146. Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the Battery Defect's true nature, quality, and character in the Class Vehicles.

147. Based on the above, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII. CHOICE OF LAW ALLEGATIONS

148. Because Plaintiff brings this Complaint in New York, New York's choice of law regime governs the state law allegations in this Complaint. Under New York's choice of law rules, New York law applies to the claims of all Class Members, regardless of their state of residence or state of purchase, as Plaintiff believes there is no conflict between New York's law and the laws of other states with an interest in the outcome of this litigation.

## VIII. CLASS ALLEGATIONS

### NATIONWIDE CLASS

149. Under Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of a Nationwide Class as defined as follows: All persons who purchased or leased a 2020-2024 Jeep Wrangler 4xe and/or a 2022-2024 Jeep Grand Cherokee 4xe.

### STATE SUB-CLASSES

150. In addition to, or as an alternative to, the Nationwide Class, and according to Rule 25(c)(5) and/or the respective state statute(s), Plaintiff may seek to represent all members of the following Sub-Classes of the Nationwide Class ("State Sub-Classes"), as well as any Sub-Classes or issue classes as Plaintiff may propose and/or this Court may designate at the time of class certification, including, but not limited to, claims under the consumer protection and unfair and deceptive trade practices statutes and warranty statutes of each of the jurisdictions below:

**NEW YORK CLASS**

> All persons who purchased or leased a 2020-2024 Jeep Wrangler 4xe and/or a 2022-2024 Jeep Grand Cherokee 4xe within the State of New York.

151. Plaintiff reserves their rights before the Court determines whether certification is appropriate to redefine the proposed Nationwide Class, or to propose Sub-Classes, if necessary, including, but not limited to, the State Sub-Class.

152. Unless otherwise stated, the above defined Nationwide Class and State Sub-Class are together referred to as the "Class" or "Classes."

153. Excluded from the Class are individuals with personal injury claims resulting from the Battery Defect in the Class Vehicles. Also excluded from the Class are Defendants and their officers, executives, subsidiaries and affiliated; governmental entities; and the Judge to whom this case is assigned and their immediate family. Plaintiff reserves the right to revise the definition of any Class based on information learned through discovery.

154. Certification of Plaintiff's claims for class wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

155. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Rule 23.

156. *Numerosity:* Rule 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiff is informed and believes – based on publicly available sales data for the Class Vehicles – that there are at least thousands of Class Members, the precise number of Class Members is unknown to Plaintiff. Still, it may be ascertained from Defendants' books and records, and/or through the state Division of Motor Vehicles' registration records.

157. *Commonality and Predominance:* Rule 23(a)(2) & (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class Members, including, without limitation:

a. Whether Stellantis engaged in the conduct alleged herein;

b. Whether Stellantis designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c. Whether the Class Vehicles contain a Defect in their battery system;

d. Whether the Battery Defect is a material fact that a reasonable consumer would consider in purchasing a Class Vehicle;

e. Whether and how long Stellantis knew or should have known about the Battery Defect in the Class Vehicles;

f. Whether and when Stellantis discovered the Battery Defect, and what, if anything, it did in response;

g. The nature of uniform representations Stellantis made about the Class Vehicles' reliability;

h. Whether Stellantis had a duty to disclose relevant information about the Battery Defect;

i. Whether Stellantis concealed and omitted material information about the Battery Defect;

j. The relevant warranties made by Stellantis relating to the Class Vehicles and the Battery Defect;

k. Whether Stellantis sought to minimize its warranty expenses by refusing to repair or replace the Battery Defect in the Class Vehicles;

l. Whether Stellantis breached contracts;

m. Whether Stellantis engaged in fraudulent concealment;

n. Whether Plaintiff and other Class Members overpaid for their Class Vehicles;

o. Whether Plaintiff sustained out of-pocket loses from repairs arising out of the Battery Defect, and if so, how much;

p. Whether the Class Vehicles were unfit for the ordinary purpose for which they were sold;

q. Whether Plaintiff and other Class Members are entitled to a declaratory judgment;

r. Whether Plaintiff and other Class Members are entitled to equitable relief, including a preliminary injunction;

s. Whether Stellantis were or are obligated to inform Class Members of any potential claims; and

t. Whether Plaintiff and the other Class Members are entitled to damages and other monetary relief and, if so, in what amount.

158. *Typicality:* Rule 23(a)(3): Plaintiff's claims are typical of all the other Class Member's claims because, among other things, all Class Members were comparably injured through Defendants' wrongful conduct as described above.

159. *Adequacy:* Rule 23(a)(4): Plaintiff is an adequate Class Representative because his interests do not conflict with the interests of the other Class Members he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the Class's interests.

160. *Declaratory Relief:* Rule 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiff and Class Members, thereby making declaratory relief appropriate, with respect to each Class as a whole.

161. *Superiority:* Rule 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individual litigate these claims against Defendants, so it would be impracticable for the Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, such litigation creates a potential for inconsistent contradictory judgments. It increases the delay and expense to all parties and the court system. By contrast, a class action is suited and intended to manage such difficulties and provide the benefits of uniform and common adjudication, economy of scale, and comprehensive supervision.

## IX. CAUSES OF ACTION

## NATIONWIDE COUNTS AND, IN THE ALTERNATIVE, STATE COUNTS

### COUNT I
**Negligent Misrepresentation**
**(Individually and on behalf of the Nationwide Class)**
**(As to All Defendants)**

162. Plaintiff re-alleges and incorporates by reference allegations in paragraphs 1 through 161 as though fully set forth herein.

163. Plaintiff brings this claim on behalf of himself and the members of the Nationwide Class and, in the alternative, on behalf of the State Sub-Class.

164. Stellantis knew or should have known about the Battery Defect.

165. Stellantis owed a duty to disclose the Battery Defect and its corresponding safety risk to Plaintiff and Class Members because Stellantis made partial statements about the Class Vehicles, possessed superior and exclusive knowledge regarding the Battery Defect and the risks associated with the Battery Defect, and falsely and misleadingly marketed the Class Vehicles.

166. Stellantis's partial statements about the useful life of the Class Vehicles, the expected life of the Battery, the emissions rates, the efficiency of the battery, the efficiency of the electric motor, its cooling capabilities, and its torque and power that Stellantis, through Jeep, promoted on its website, in press releases released to the media, in Monroney labels and other marketing materials, and in owner's manuals, warranty and maintenance guides, caused Plaintiff to purchase the Class Vehicles without full knowledge of the Battery Defect. Plaintiff placed his trust in Stellantis to give him all the details necessary to make an informed purchase decision, but Stellantis provided only partial disclosure of facts basic to the transaction – *i.e.,* Stellantis failed to disclose that the Class Vehicles contained a Battery Defect.

167. All Class Vehicles' batteries are subjected to a catastrophic defect that may cause the spontaneous combustion of the vehicle. Upon information and belief, all Class Vehicles contain the Battery Defect.

168. Stellantis negligently misrepresented and omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the Battery in the Class Vehicles is defective and prone to premature failure, exposing drivers, occupants and members of the public to significant safety risks. Due to Stellantis's negligent conduct, Class Members have suffered actual damages.

169. As a result of Stellantis's failure to disclose the material fact that the Battery in the Class Vehicles is defective and prone to premature failure, owners and lessors of the Class Vehicle are required to no longer charge their vehicle's battery and ensure that the vehicle is not parked near any physical structures. Additionally, owners and lessors of the Class Vehicle are unable to use the vehicle for its full intended purpose until Stellantis puts forth a remedy.

170. Stellantis owed a duty to disclose the Battery Defect and its corresponding safety risk to Plaintiff and Class members because Stellantis possessed exclusive knowledge regarding the Defect and the risks associated with the Battery Defect and was thus in a far superior position as to Plaintiff and Class Members to disclose material facts basic to the transaction including the Battery Defect and its corresponding safety risk.

171. Stellantis also owed a duty to disclose the Battery Defect and its corresponding safety risk to Plaintiff and Class Members because Defendants made false, misleading and/or ambiguous partial statements about the nature and quality of the Batteries installed in the Class Vehicles and Plaintiff and Class Members reposed trust in Stellantis to provide full and complete information or otherwise to correct incomplete, false or misleading partial statements. Moreover,

based on its knowledge of the Battery Defect, Stellantis was in a superior position as to Plaintiff to make their incomplete and partial statements about the Batteries complete.

172. That the Battery installed in the Class Vehicles will prematurely fail, resulting in devastating vehicle fire, is material because it presents a significant safety risk and places the drivers, occupants, and members of the public at risk of serious injury or death.

173. That the Battery installed in the Class Vehicles will prematurely fail, requiring costly replacement, is material because Plaintiff and Class Members expected the Battery to last for the expected useful life of the Class Vehicles.

174. That the Battery installed in the Class Vehicles cannot be charged and/or used, unless repaired or replaced, is material because part of the bargain for purchasing a hybrid vehicle is the use of the Battery and electronic drivetrain system to increase power and/or fuel efficiency of the vehicle.

175. Plaintiff and Class Members would not have purchased the Class Vehicles but for Stellantis's negligent false representations and omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Battery Defect, or would have paid less for the class vehicle.

176. Plaintiff and Class Members justifiably relied on Stellantis's negligent false representations and omissions of material facts. As a direct and proximate result of Stellantis's negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the Battery Defect, Plaintiff and Class Members have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT II
**Fraud by Omission or Fraudulent Concealment**
**(Individually and on behalf of the Nationwide Class)**
**(As to All Defendants)**

177. Plaintiff re-alleges and incorporates by reference allegations in Paragraphs 1 through 161 as though fully set forth herein.

178. Plaintiff brings this claim on behalf of himself and the members of the Nationwide Class and, in the alternative, on behalf of the State Sub-Class.

179. Stellantis intentionally and knowingly falsely concealed, suppressed and/or omitted material facts including as to the standard, quality, or grade of the Class Vehicles, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiff and Class Members rely on Defendants' misrepresentations and omissions. Due to Defendants' fraudulent conduct, Plaintiff and Class Members have suffered actual damages.

180. Stellantis knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Battery Defect. To date, Defendants have not provided Plaintiff and Class Members with a repair or remedy for the Battery Defect.

181. Defendants were obligated to disclose the Battery Defect and its corresponding safety risk to Plaintiff and Class Members because (1) Defendants possessed superior and exclusive knowledge of the Defect and (2) made partial disclosures regarding the reliability and safety of the Class Vehicles. Rather than disclose the Battery Defect, Defendants intentionally and knowingly concealed, suppressed and/or omitted material facts, including as to the standard, quality or grade of the Class Vehicles and the presence of the Battery Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the costs of repair or replacement.

182. The Battery Defect is material because no reasonable consumer expects that the Battery installed in the Class Vehicles will prematurely fail, likely resulting in a devastating vehicle fire. Additionally, no reasonable consumer expects to place the driver, occupants, and members of the public at risk of serious injury or death.

183. The Battery Defect is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Battery Defect, that can cause catastrophic failure with little to no warning or time to take preventative measures or safely remove the vehicle from the road or a location near structures built on private or public property.

184. Plaintiff and Class Members would not have purchased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Battery Defect, or would have paid less for the Class Vehicles.

185. Defendants knew their misrepresentation, concealment, and suppression of material facts was false and misleading and knew the effect of concealing those material facts.

186. Defendants acted with malice, oppression, and fraud.

187. Plaintiff and Class Members reasonably relied on Defendants' knowing, affirmative, and active false representations, concealment and omissions. As a direct and proximate result of Defendants' false representations, omissions and active concealment of material facts regarding the Battery Defect, Plaintiff and Class Members have suffered actual damages in an amount to be determined at trial.

## COUNT III
## Unjust Enrichment
## (Individually and on behalf of the Nationwide Class)
## (As to All Defendants)

188. Plaintiff re-alleges and incorporates by reference allegations in Paragraphs 1 through 161 as though fully set forth herein.

189. Plaintiff brings this claim on behalf of himself and the members of the Nationwide Class and, in the alternative, on behalf of the State Sub-Class.

190. Stellantis made affirmative representations to Plaintiff and Class Members, including that its Class Vehicles were durable, reliable, and dependable. These affirmations of fact become part of the basis of the bargain and thus created an express warranty that the Class Vehicles conformed to Defendants' affirmations of fact.

191. Stellantis knew that the Class Vehicles were not durable, reliable, or dependable due to the Battery Defect, which makes the Class Vehicles prone to battery failure and spontaneous combustion of the vehicle.

192. Plaintiff and Class Members purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicle possessed the Battery Defect, contrary to Defendants' representations about the durability, reliability, and dependability of the vehicles. Plaintiffs thereby conferred a direct benefit to Defendants.

193. Defendants received and retained a benefit and were unjustly enriched at the expense of and to the detriment of Plaintiff and Class Members, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. Defendants were also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiff and the Class Members would have otherwise not bought or leased the Class Vehicle or would have paid substantially less for them absent Defendants' affirmative misrepresentations and material omissions.

194. Plaintiff and Class Members therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of Defendants' wrongfully procured profits.

**COUNT IV**
**Violations of 15 U.S.C. § 2301, *et seq.***
**The Magnuson-Moss Warranty Act**
**(Individually and on behalf of the Nationwide Class)**

**(As to All Defendants)**

195. Plaintiff re-alleges and incorporates by reference allegations in Paragraphs 1 through 161 as though fully set forth herein.

196. Plaintiff brings this claim on behalf of himself and the members of the Nationwide Class and, in the alternative, on behalf of the State Sub-Class. This court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

197. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

198. Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

199. Defendants are considered a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

200. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written and/or implied warranty.

201. Defendants' warranties are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

202. Defendants breached the express warranties by:

a. Providing 36 months or 36,000 miles Basic Limited Warranty with the purchase or lease of all new Class Vehicles, thereby warranting to repair or replace any defective part defective in material or workmanship at no cost to the owner or lessee;

b. Selling and leasing Class Vehicles with the Battery Defect, and which thus were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c. Refusing and/or failing to honor the express warranties by effectively repairing the Battery Defect free of charge and within a reasonable time.

203. Defendants provided Plaintiff and Class Members with an implied warranty of merchantability in connection with the purchase or lease of the Class Vehicle that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

204. Defendants breached these implied warranties and are therefore liable to Plaintiff and the Class Members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect and/or manufacturing workmanship and materials defect in that they are designed and equipped with a defective high voltage battery pack that contain battery cells which are susceptible to separator damage. Separator damage, combined with other complex interactions between the cells, will lead to vehicle fire, which poses an unreasonable risk of death, serious bodily injury and/or property damage. As a result, every Class Vehicle contains the Battery Defect, which can cause the Class Vehicle to catch fire while parked or driven thereby making the Class Vehicles unmerchantable.

205. In its capacity as a warrantor, as Defendants had knowledge of the defects in the Class Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage

of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit liability for the Class Vehicles is null and void.

206. The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendants and Plaintiff and the Class Members, as, at the time of purchase and/or lease, Plaintiff and the other Class Members had no other options for purchasing warranty coverage other than directly from Defendants.

207. The limitations on the warranties are substantively unconscionable. Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendants failed to disclose these defects to Plaintiff and the other Class Members. Thus, Defendants' enforcement of the duration limitations on those warranties is harsh and shocks the conscience.

208. Plaintiff and each Class Member have had sufficient direct dealings with Defendants or their agents to establish privity of contract. Nonetheless, privity is not required because Plaintiff and each Class Member are intended third-party beneficiaries of contracts between Defendants and their agents, and specifically of the implied warranties. Defendants agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for, and intended to solely benefit the consumers.

209. Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this Class Action and is not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

210. Furthermore, affording either Defendant an opportunity to cure its breach of written

warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or were reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect or the defect caused through workmanship and materials. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resorts to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused thereby deemed satisfied.

211. Moreover, Defendants received reasonable notice of Plaintiff's nationwide breach of warranty claims on March 3, 2025, when Plaintiff mailed notice letters to Defendants.

212. Plaintiff and the other Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class Members have not re-accepted their Class Vehicles by retaining them.

213. As a direct and proximate cause of Defendants' breach of the written warranties, Plaintiff and the other Class Members sustained damages and other loses in an amount to be determined at trial. Defendants' conduct damaged Plaintiff and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, overpayment and diminution in value damages, and costs, including statutory attorneys' fees, and/or other relief as deemed appropriate by the Court.

214. The amount in controversy of Plaintiff's individual claims meet or exceed the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest

and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of the other Class Members, seeks all damages permitted by law, including diminution in value of their vehicle, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and Class Members in connection with the commencement and prosecution of this action.

215. Further, Plaintiff and Class Members are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Plaintiff also seeks available declaratory relief. Based on Defendants' continuing failure to fix the known defects, Plaintiff seeks declarations that:

a. The Class Vehicles are designed and equipped with a defective high voltage battery pack that contain battery cells, which are susceptible to separator damage. Separator damage, combined with other complex interactions between the cells, will lead to vehicle fire. As a result, every Class Vehicle contains the Battery Defect, which can cause the Class Vehicle to catch fire while parked or driven. The Battery Defect may not manifest until after the warranty provided by Defendants has expired. The defect is material and requires disclosure to all Class Members and future consumers.

b. All Class Members are to be provided the best practicable notice of the Battery Defect, which cost shall be borne by Defendants.

c. Because the Class Vehicles have the Battery Defect, and because Defendants knew of this Defect before the time of sale or lease, Defendants' warranties are insufficient to remediate the defects known by Defendants to exist. Therefore,

Defendants' existing warranties, limited to three years and 36,000 miles, are invalid, and, as such, that limitation is unenforceable. Defendants shall provide notice to all persons covered by that warranty of the removal of this time limitation.

d. Defendants shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the Battery Defect in the Class Vehicles.

e. Defendants shall establish a repair program and protocol to be communicated directly to Class Members, which will require Defendants to inspect, upon request, a Class Member's vehicle to determine whether the Battery Defect is manifest. Any disputes over coverage shall by adjudicated by a Special Master appointed by the Court and agreed to by the parties.

216. Plaintiff and Class Members also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Battery Defect in their Class Vehicles. Such expenses and losses will continue as Plaintiff and Class Members are forced to take time off from work, pay for rental cars or other transportation arrangements, childcare, non-defective high voltage batteries, and the myriad of other expenses involved in going through the repair and/or replacement process.

217. The right of Plaintiff and Class Members to recover these expenses as an equitable matter to put them in a place they would have been but for Defendants' conduct presents common questions of law. Equity and fairness require the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

**NEW YORK COUNTS**

**COUNT V**
**Violation of N.Y. Gen. Bus. Law § 349**
**(Individually and on Behalf of the New York Class)**
**(As to All Defendants)**

218. Plaintiff re-alleges and incorporates by reference allegations in paragraphs 1 through 161 as though fully set forth herein.

219. Plaintiff Eric Fishon (for this Count, "Plaintiff") brings this claim on behalf of himself and the New York Sub-Class against Defendants.

220. Defendants violated the New York General Business Law ("NYGBL") by engaging in deceptive acts or practices directed to consumers in connection with the sale and/or lease of the Class Vehicles.

221. Defendants knowingly concealed, suppressed and/or omitted material facts regarding the Battery Defect and its corresponding safety risk, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff and Members of the New York Sub-Class. Plaintiff and Members of the New York Sub-Class could not reasonably have known about the Battery Defect and its corresponding safety risk as the information was in the superior and exclusive control of the defendants.

222. Defendants owed a duty to disclose the Battery Defect and its corresponding safety risk to Plaintiff and Members of the New York Sub-Class because they possessed superior and exclusive knowledge regarding the Battery Defect and the risks associated with the manifestation of the Battery Defect. Rather than disclose the Battery Defect, Defendants engaged in deceptive acts or practices to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the Battery Defect to Plaintiff and Members of the New York Sub-Class.

223. Defendants' deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Battery Defect were intended to mislead consumers, were misleading to reasonable consumers, and misled Plaintiff and Members of the New York Sub-Class.

224. At all relevant times, Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or omissions regarding the Battery Defect and its corresponding safety risk were material to Plaintiff and Members of the New York Sub-Class. When Plaintiff and Members of the New York Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles Batteries were free from defects or alternatively, would be covered under Defendants' express warranties. Had Defendants disclosed that the Battery Defect may fail and/or create an unavoidable safety risk, Plaintiff and members of the New York Sub-Class would not have purchased or leased the Class Vehicles, or would have paid substantially less for their vehicles.

225. Defendants had a continuous duty to Plaintiff and Members of the New York Sub-Class to refrain from unfair and deceptive practices under the NYGBL and to disclose the Battery Defect. Defendants' deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Battery Defect and corresponding safety risk are substantially injurious to consumers. As a result of Defendants' knowing, intentional concealment, suppression and/or omission of the Battery Defect in violation of the NYGBL, Plaintiff and Members of the New York Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the Battery Defect and/or actual damages in the amount of the cost to replace the Battery Defect and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result

of Defendants' deceptive acts or practices in the course of their business.

226. Defendants' deceptive acts or practices occurred in the conduct of business, trade or commerce.

227. Defendants have knowingly and willfully engaged in deceptive acts or practices alleged herein. Further, Defendants unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles contained the undisclosed Battery Defect and corresponding risks to safety and property.

228. Defendants' deceptive acts or practices affect the public interest and present a continuing safety risk to Plaintiff, Members of the New York Sub-Class, and the public at large.

229. As a direct and proximate result of Defendants' violations of the NYGBL, Plaintiff and Members of the New York Sub-Class have suffered actual damages and/or injury in fact.

230. As a result of Defendants' unlawful conduct, Plaintiff and Members of the New York Sub-Class are entitled to actual damages, treble damages, costs of litigation, attorneys' fees, injunctive and other equitable relief. *See* N.Y. GEN. BUS. LAW § 349(h).

**COUNT VI**
**Breach of Express Warranty**
**N.Y. U.C.C. Law §§ 2-313, 2A-103, and 2A-210**
**(Individually and on Behalf of the New York Class)**
**(As to All Defendants)**

231. Plaintiff re-alleges and incorporates by reference allegations in paragraphs 1 through 161 as though fully set forth herein.

232. Plaintiff Eric Fishon (for this Count, "Plaintiff") brings this claim on behalf of himself and the New York Sub-Class against Defendants.

233. Stellantis is and was a "merchant" with respect to motor vehicles under N.Y. U.C.C. Law § 2-104(1) and a "seller" and "lessor" of motor vehicles under § 2-103(1)(d) and § 2A-

103(1)(p).

234. The Class Vehicles are and were "goods" under N.Y. U.C.C. Law §§ 2-105(1) and 2A-103(1)(h).

235. Stellantis provided Plaintiff and Members of the New York Sub-Class with one or more express warranties in connection with the purchase or lease of Class Vehicles. Under the warranties provided to Plaintiff and the New York Sub-Class, Stellantis promised to repair and/or replace covered defective components, at no cost to owners and lessees of the Class Vehicles. As alleged herein, Defendants breached these warranties.

236. Stellantis marketed the Class Vehicles are high quality, reliable, and safe vehicles, and that it would stand behind the quality of their products and promptly repair any defects. These statements helped conceal the existence of the Battery Defect and its corresponding safety risk from Plaintiff and Members of the New York Sub-Class,

237. Plaintiff and Members of the New York Sub-Class have had sufficient direct dealings with Stellantis or its agents, its authorized dealerships, to establish privity of contract between Stellantis and Plaintiff and Members of the New York Sub-Class.

238. Nonetheless, privity is not required here because Plaintiff and each of the Members of the New York Sub-Class are intended third-party beneficiaries of contracts between Stellantis and their authorized dealers. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

239. Stellantis's warranties formed a basis of the bargain that was reached when Plaintiff and Members of the New York Sub-Class purchased or leased their Class Vehicles. Given that the

Battery Defect is by design, the warranties are substantively unconscionable because Stellantis knew of the Battery Defect and manipulated the warranties in such a manner to avoid paying the costs to repair and/or replace the Battery Defect.

240. Plaintiff and Members of the New York Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses. Despite the existence of the warranties, Stellantis failed to adequately inform Plaintiff and Members of the New York Sub-Class that the Class Vehicles contained the Battery Defect and failed to provide a suitable repair or replacement of the Battery Defect free of charge within a reasonable time.

241. On information and belief, Stellantis has not suitably repaired or replaced the Battery Defect free of charge for Plaintiff and Members of the New York Sub-Class despite the existence of the Battery Defect in the Class Vehicles at the time of sale or lease.

242. The warranties accompanying Class Vehicles were procedurally and substantively unconscionable because of the disparity in bargaining power of the parties, the purchasers' lack of knowledge that the Class Vehicles were defective, the inability of the Class Vehicle purchasers to bargain with Stellantis to increase coverage of the warranties, their lack of knowledge, their lack of meaningful alternatives, disparity in sophistication of the parties, unfair terms in the warranty (including but not limited to, exclusion of design defects that unfairly favored Stellantis particularly where the Battery Defect was known only to Stellantis and the warranty unfairly shifted repair costs to consumers when the Battery Defect manifests in the Class Vehicles during their reasonably expected life), and absence of effective warranty competition.

243. The time limits contained in Stellantis's warranty periods were also unconscionable and inadequate to protect Plaintiff and Members of the New York Sub-Class. Among other things, Plaintiff and Members of the New York Sub-Class did not determine these time limitations, the

terms of which unreasonably favored Stellantis. A gross disparity in bargaining power existed between Stellantis and Class Members, and Stellantis knew, or should have known, that the Class Vehicles were defective at the time of sale or lease and that the Battery Defect posed a significant safety risk to drivers, occupants, and the public.

244. Stellantis was provided reasonable notice of these issues by way of letters sent by Plaintiff on March 3, 2025. Alternatively, any opportunity to cure the breach is unnecessary and futile.

245. Because of the Battery Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe, reliable transportation.

246. As a direct and proximate result of Stellantis's breach of express warranties, Plaintiffs and Members of the New York Sub-Class have been damaged in an amount to be determined at trial.

247. In the alternative, should Stellantis claim that the Battery Defect is covered under the warranties, the warranties now fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and Members of the New York Sub-Class whole because, Stellantis has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

248. Finally, because of Stellantis's breach of express warranty as set forth herein, Plaintiff and Members of the New York Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Members of the New York Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT VII**
**Breach of Implied Warranty of Merchantability**
**N.Y. U.C.C. Law §§ 2-314, 2A-103, and 2A-212**
**(Individually and on Behalf of the New York Class)**
**(As to All Defendants)**

249. Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 through 161 as though fully set forth herein.

250. Plaintiff Eric Fishon (for this Count, "Plaintiff") brings this claim on behalf of himself and the New York Sub-Class against Defendants.

251. Stellantis is and was a "merchant" with respect to motor vehicles under N.Y. U.C.C. Law § 2-104(1) and a "seller" and "lessor" of motor vehicles under § 2-103(1)(d) and § 2A-103(1)(p).

252. The Class Vehicles are and were "goods" under N.Y. U.C.C. Law §§ 2-105(1) and 2A-103(1)(h).

253. Plaintiff and Members of the New York Sub-Class purchased or leased the Class Vehicles from Stellantis by and through Stellantis's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Stellantis was the manufacturers, distributors, warrantors and/or sellers of the Class Vehicles. Stellantis knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

254. A warranty that the Class Vehicles with the Battery Defect were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law under N.Y. U.C.C. Law §§ 2-314 and 2A-212.

255. Stellantis breached the implied warranty of merchantability because the Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and

were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect – the Battery Defect – (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Stellantis breached its implied warranty of merchantability.

256. Plaintiff and Members of the New York Sub-Class have had sufficient direct dealings with Stellantis or their agents, their authorized dealerships to establish privity of contract between Stellantis and Plaintiff and Members of the New York Sub-Class.

257. Nonetheless, privity is not required here because Plaintiff and each of the other Members of the New York Sub-Class are intended third-party beneficiaries of contracts between Stellantis and their dealers. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

258. Stellantis was provided reasonable notice of these issues by way of letters sent by Plaintiff on March 3, 2025. Alternatively, any opportunity to cure the breach is unnecessary and futile.

259. Any attempt by Stellantis to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, any limitation on Stellantis's warranty is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Battery Defect. Any applicable time limits contained in Stellantis's warranty periods were also unconscionable and inadequate to protect Plaintiff and Members of the New York Sub-Class. Among other things, Plaintiffs and Members of the New York Sub-Class did not determine these limitations, the terms of which

unreasonably favored Defendants. A gross disparity in bargaining power existed between Stellantis and Plaintiff and Members of the New York Sub-Class, and Stellantis knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Battery Defect posed a significant safety risk to drivers, occupants, and the public at large.

260. Plaintiff and Members of the New York Sub-Class have been excused from performance of any warranty obligations as a result of Stellantis's conduct described herein.

261. As a direct and proximate result of Stellantis's breach of the implied warranty of merchantability, Plaintiff and Members of the New York Sub-Class have been damaged in an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of Members of the Nationwide Class and State Sub-Class, respectfully request that the Court enter judgment in his favor against Stellantis as follows:

A. Certification of the proposed Nationwide Class and State Sub-Class, with Plaintiff as class representative;

B. Appointment of Plaintiff's Counsel as Class Counsel;

C. A declaratory judgment that the Batteries in the Class Vehicles contain battery cells which are susceptible to separator damage, and, as a result, may spontaneously combust and which requires disclosure;

D. Injunctive relief, including, but not limited to:

a. Requiring Stellantis to treat problems arising from the Battery Defect under the warranty;

b. Requiring Stellantis to reassess all prior warranty claims related to the Battery

Defect; and

c. Requiring Stellantis to pay for the cost of inspection to determine whether the Battery Defect is present in the vehicles of Class Members, with any coverage disputes adjudicated by a special master.

E. Restitution, including at the election of Class Members, recovery of the purchase price of their Class Vehicles, or the overpayment of diminution in value of their Class Vehicles;

F. Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

G. An order requiring Stellantis to pay both pre- and post-judgment interest on any amounts awarded;

H. An award of costs and attorney's fees; and

I. Such other or further relief as may be deemed appropriate by the Court.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Dated: March 4, 2025

Respectfully submitted,

*/s/ James E. Cecchi*

James E. Cecchi
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

Zachary A. Jacobs*
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
222 S Riverside Plaza,
Chicago, Illinois 60606

Telephone: (973) 994-1700
zjacobs@carellabyrne.com

*Counsel for Plaintiff and the Proposed Class*
* *To be admitted pro hac vice*